# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**KERRIE BERNDT,**

    **Plaintiff,**

    **v.**                                       **Case No. 20-CV-838-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Kerrie Berndt seeks social security disability benefits based on chronic pain and fatigue stemming from fibromyalgia, depression, and anxiety. Following a hearing, an administrative law judge determined that Berndt was not disabled because she could still perform unskilled, sit-down jobs with certain physical and mental limitations. Berndt now seeks judicial review of that decision, arguing that the ALJ failed to properly evaluate the severity of her fibromyalgia and its resulting limitations and failed to accommodate all her mental limitations. Because substantial evidence supports the ALJ's decision and Berndt has failed to demonstrate that the ALJ committed an error of law in reaching his decision, I will affirm the denial of disability benefits.

## BACKGROUND

Berndt filed this action on June 4, 2020, seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me in August 2020 after all parties consented to magistrate-judge

jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 8, 9. It is now

fully briefed and ready for disposition. *See* ECF Nos. 21, 28, 31.

## I.      Procedural History

Berndt applied for social security disability benefits in November 2017, alleging that

she became disabled on January 30, 2017, when she was forty-three years old. R. 13, 215–16.[1]

Berndt asserted that she was unable to work due to fibromyalgia, depression, anxiety, and

Raynaud's disease. R. 237. In her function report, Berndt stated that she could no longer walk,

carry heavy trays, bend, lift, or perform any jobs that involved physical exertion due to pain

and fatigue. R. 246. She further stated that she had no problems with personal care, she could

make simple meals (like a sandwich), she was able to do light housework (like loading the

dishwasher or doing an occasional load of laundry), she left the house daily, she did online

shopping once a week, she enjoyed reading and watching television, and she frequently

socialized with others (e.g., at church or spending time with family). R. 246–54. Berndt

reported that her impairments caused difficulties lifting, squatting, bending, standing,

reaching, walking, kneeling, climbing stairs, and completing tasks. R. 251. She also reported

that she did not handle stress or changes in routine "very well at all." R. 252. Berndt indicated

that she had "no limit" sitting but estimated that she could stand only eight minutes at a time

and one to one-and-a-half hours per day and walk up to ten minutes at a time and up to an

hour per day. R. 254.

Berndt's application was first reviewed at the state-agency level by the Wisconsin

Disability Determination Bureau. At the initial level of review, the state-agency physician

---

[1] The transcript is filed on the docket at ECF No. 15-2 to ECF No. 15-23.

charged with reviewing the medical evidence of record opined that Berndt could perform light work.[2] R. 78–79. Based on her review of the record, state-agency psychologist Ellen Rozenfeld, PsyD, opined that Berndt's mental-health impairments were not presumptively disabling because she did not have an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning a person uses in a work setting (known in social security lexicon as the "paragraph B" criteria): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. 76. Dr. Rozenfeld further opined that Berndt retained the ability to perform simple, repetitive tasks on a sustained basis in a work setting with routine workplace changes. R. 79–80. Based on those findings, the state agency determined that Berndt was not disabled and denied her application. *See* R. 67–84.

Berndt requested reconsideration, alleging that her impairments continued "to prevent her from being able to work in any capacity" and significantly impact her day-to-day life. R. 118, 268. She did not, however, claim to suffer from any new medical conditions. *See* R. 268. Because the record was limited with respect to recent mental health treatment, the state agency referred Berndt for a psychological consultative examination. *See* R. 311.

Scott Trippe, PsyD, examined Berndt in October 2018 and prepared a report of his findings. *See* R. 1529–32. During the mental-status examination, Berndt cried occasionally but demonstrated normal thought content, intact memory, a good fund of working knowledge, the use of abstract thinking, and intact practical reasoning skills in most areas. R. 1530–31. Berndt also "exhibited no significant difficulty staying focused for the hour-long

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

interview," "[s]he was able to count backwards from 100 by sevens without difficulty," and "she was able to spell 'world' backwards." R. 1531.

Based on his examination and a review of select medical records, Dr. Trippe assessed Berndt's ability to work a full-time job. *See* R. 1532. He opined that Berndt "does not appear to have difficulty understanding, recalling, and carrying out simple instructions" or "responding appropriately to her supervisors and co-workers"; "appears to have the psychological resources to effectively deal with work stresses or adapt to changes at work"; and "does not appear to need the assistance of others to protect her financial interests and manage her daily needs." *Id.* However, Dr. Trippe further opined that Berndt "may have difficulty maintaining concentration and attention." *Id.*

Thereafter, the Wisconsin Disability Determination Bureau denied Berndt's application upon reconsideration. *See* R. 85–104. Like the state-agency physician at the initial level of review, the state-agency physician at the reconsideration level opined that Berndt could perform light work. R. 98–99. The state-agency psychologist at the reconsideration level, Michael Cremerius, PhD, agreed with Dr. Rozenfeld's opinion that Berndt's mental impairments were not presumptively disabling, though his evaluation of the paragraph B criteria differed slightly. *See* R. 95–97. On his mental residual functional capacity assessment form, Dr. Cremerius indicated that Berndt was moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to interact appropriately with the general public. R. 99–101. Dr. Cremerius opined that, "during periods of pain exacerbations, [Berndt's] preoccupation with her physical issues including pain would interfere with [her] ability to perform complex tasks," but "[s]imple and detailed tasks would

4

remain intact." R. 100. He further opined that Berndt could engage in only "brief and superficial contact with the public" during pain exacerbations. *Id.*

After the Commissioner denied her application at the state-agency level, Berndt (along with her attorney) appeared via video for a hearing before ALJ Brent C. Bedwell on August 15, 2019, at which Berndt and a vocational expert testified. *See* R. 31–55. Berndt testified that she previously worked as a server at a busy restaurant and as a patient service representative at a hospital. R. 38–39. She claimed that she was no longer able to work due to chronic, burning pain throughout basically her entire body; she also complained of chronic fatigue. R. 40–41. Berndt testified that she was unable to do any of the things she listed in her function report. R. 43–44. She stated, "I am pretty much bedridden." R. 40. Berndt further testified that, since 2017, she had been dealing with mental-health issues stemming from her deteriorating physical health and lack of answers concerning her treatment options. R. 49.

The vocational expert testified next. *See* R. 49–54. He first identified Berndt's two past relevant jobs as a server (performed at the medium exertional level) and an office assistant (performed at the light exertional level). R. 51. According to the vocational expert, a hypothetical person with Berndt's age, education, and work experience could not perform either of those jobs if she were limited to a restricted range of sedentary work. R. 51–52. That person could, however, perform other jobs, such as a quotation clerk, a document preparer, or an addresser. R. 52. The vocational expert testified that no jobs would be available if the person required unscheduled breaks throughout the workday or were absent from work more than one or two days per month. R. 52–53.

On September 19, 2019, the ALJ issued a written decision determining that Berndt was not disabled and denying benefits. R. 10–30. The Social Security Administration's

5

Appeals Council subsequently denied Berndt's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). This action followed.

## II. The ALJ's Decision

To be considered disabled under the Social Security Act, Berndt had to prove that she was "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The social security regulations set out a five-step sequential evaluation process to determine disability status. *See* 20 C.F.R. § 404.1520(a)–(g). Berndt had the burden of proof at each of the first four steps; the burden shifted to the Commissioner at the fifth, and final, step. *See Due v. Massanari*, 14 F. App'x 659, 664 (7th Cir. 2001) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

Applying this standard five-step process, the ALJ here concluded that Berndt was not disabled. *See* R. 13–25. The ALJ determined at step one that Berndt had not engaged in substantial gainful activity since January 30, 2017, her alleged onset date. R. 15. At step two, the ALJ found that Berndt had four "severe"[3] impairments: degenerative disc disease, fibromyalgia, depression, and anxiety. R. 15–16. The ALJ determined at step three that Berndt's impairments, alone or in combination, did not meet or medically equal the severity of a presumptively disabling impairment. R. 16–17. With respect to her mental impairments, the ALJ found that Berndt had a mild limitation in her ability to understand, remember, or

---

[3] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

apply information; a mild limitation in her ability to interact with others; a moderate limitation in her ability to concentrate, persist, or maintain pace; and a moderate limitation in her ability to adapt or manage herself. *Id.*

The ALJ next assessed Berndt's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. § 404.1545(a)(1). The ALJ found that Berndt could perform sedentary work[4] with several additional limitations: she is unable to climb ladders, ropes, and scaffolds; she can only occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs; she is limited to jobs that are unskilled and involve only simple and routine tasks; and she is limited to jobs having only occasional decision making and changes in the work setting. R. 18. In assessing this RFC, the ALJ considered the medical evidence, Berndt's subjective allegations, and the medical opinion evidence and prior administrative medical findings. *See* R. 18–24.

According to the ALJ, the medical records did not substantiate fully Berndt's allegations of disability due to fibromyalgia and chronic pain symptoms. R. 20. The ALJ provided three reasons to support this finding. First, the ALJ noted that treatment records showed "many subjective complaints and very few objective findings." *Id.* And the few objective findings that were in the record showed that Berndt "consistently demonstrated good function despite her symptoms." *Id.* The ALJ cited several examples of Berndt's good functioning, including normal range of motion; normal muscle bulk, tone, and strength; intact sensation; a steady gait; no motor weakness; normal sensation; and only mild tenderness. *Id.*

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

(citing Exhibits 8F/55, 71; 16F; 17F/5; 22F/1). The ALJ also noted that Berndt's treatment provider stated there was no obvious neurological etiology for Berndt's complaints of pain and weakness and that Berndt reported that her pain was better with laser therapy. R. 20 (citing Exhibits 10F/14; 9F/17).

Second, the ALJ noted that "in July 2018, [Berndt] was discharged from a pain management program for cancellations and no-shows." R. 20. The ALJ further noted the Berndt's treatment provider indicated that Berndt did not provide a reason for her missed appointments and did not respond to the provider's phone calls. *Id.* (citing Exhibit 19F/1). According to the ALJ, the unexplained missed pain management appointments "suggests the condition is not as disabling as alleged." R. 20.

Third, the ALJ noted that "treatment providers have concluded that [Berndt's] pain complaints would be brought in better control if her anxiety disorder were addressed." *Id.* He provided two examples. In March 2017, a physician treating Berndt's pain complaints remarked that "there is a prominent psychiatric overlay making evaluation more difficult." R. 20 (citing Exhibit 8F/114). The physician "referred [Berndt] to behavioral health, stating that medical anxiety is 'playing a fair role in her difficulty with coping and also her difficulty in following through with recommendations given by myself and other providers, making elucidation of her underlying disorder more difficult.'" *Id.* According to the ALJ, "another physician made a similar link" between Berndt's physical and mental health in September 2017. R. 20 (citing Exhibit 14F/33).

The ALJ similarly concluded that the medical records did not substantiate fully Berndt's allegations of disabling mental health symptoms and limitations. R. 21. The ALJ noted that Berndt demonstrated good function up until September 2017; then, over the next

five months, she "went through a period of increased symptoms . . . , culminating in a period of hospitalization." *Id.* (citing Exhibits 5F/3; 6F/1; 8F/134, 168; 9F/1–4; and14F/4, 7). According to the ALJ, Berndt "regained good function in October 2017," and mental-status exams were normal throughout the rest of 2017. R. 21 (citing Exhibits 9F/5, 13, 23, 27, 34, 43, 47). The ALJ also noted that Berndt "demonstrated good function at the October 2018 psychological consultative examination conducted by [Dr. Trippe]." R. 20 (citing Exhibit 21F).

With respect to the opinion evidence, the ALJ first considered the opinions the state-agency medical consultants who reviewed the record and opined that Berndt could still perform light work. R. 21 (citing Exhibits 1A & 3A). The ALJ found those opinions "somewhat persuasive as they are supported by the medical evidence of record." R. 21–22. However, the ALJ determined that "limitation to the sedentary exertion level is necessary to accommodate [Berndt's] subjective complaints, as well as non-severe Baker's cyst of the left knee and calcaneal spur of the left foot." R. 22.

The ALJ next considered the opinions of Dr. Rozenfeld and Dr. Cremerius, the reviewing state-agency psychological consultants who opined that Berndt's mental impairments were not presumptively disabling. R. 22 (citing Exhibits 1A & 3A). The ALJ found Dr. Rozenfeld's opinion "somewhat persuasive as it is generally consistent with the medical evidence of record." R. 22. However, according to the ALJ, subsequent treatment records revealed that Berndt had greater mental limitations. *Id.* As for Dr. Cremerius, the ALJ concluded that his paragraph B findings were "somewhat persuasive, as [they were] generally consistent with the medical evidence of record." *Id.* However, the ALJ found "less persuasive"

Dr. Cremerius' functional capacity assessment because "it was based largely on periods of increased pain and not on mental health symptoms." *Id.*

Finally, the ALJ considered the opinion of Dr. Trippe, the psychological consultative examiner. R. 22 (citing Exhibit 21F). The ALJ found Dr. Trippe's opinion "persuasive as it is consistent with the medical evidence of record in general" and "is also consistent with Dr. Trippe's own examination findings." R. 22. As support, the ALJ noted that "[t]he mental status exam was largely normal and [Berndt] did very well during testing." *Id.*

Continuing the sequential evaluation process, the ALJ determined at step four that Berndt was unable to perform her past relevant work as a server or an office assistant. R. 24. At step five, the ALJ determined that, given her age, education, work experience, and RFC, Berndt could perform unskilled, sedentary jobs (e.g., a quotation clerk, a document preparer, or an addresser) that exist in significant numbers in the national economy. R. 24–25. Based on those findings, the ALJ determined that Berndt had not been under a disability from her alleged onset date through the date of the decision. R. 25.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings."

*Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Berndt contends that the ALJ erred in evaluating her fibromyalgia impairment and in failing to accommodate all her mental health limitations in the RFC assessment.

### I.    Fibromyalgia

Berndt first argues that the ALJ failed to properly evaluate the severity of her fibromyalgia and erred in not accommodating her fibromyalgia-related symptoms in the RFC assessment. *See* ECF No. 21 at 7–16.[5]

As the Seventh Circuit has observed, fibromyalgia is "a common, but elusive and mysterious, disease." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). "Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Id.* The Seventh Circuit has also observed that "[t]here are no laboratory tests for the presence or severity of fibromyalgia" and that the disease's principal symptoms— widespread pain, fatigue, stiffness, disturbed sleep—"are easy to fake." *Id.* at 306–07. Accordingly, "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not." *Id.* at 307 (citations omitted); *see also Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that [the plaintiff] had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period,

---

[5] Citations are to the page numbers at the bottom of Berndt's briefs, not those provided by CM/ECF.

since fibromyalgia is not always (indeed, not usually) disabling.") (citing *Sarchet*, 78 F.3d at 307). The question here is whether Berndt "is one of the minority." *Sarchet*, 78 F.3d at 307. Like with most fibromyalgia claims, the answer to that question rests largely on the believability of Berndt's subjective allegations.

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine

whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

The ALJ here rejected Berndt's allegations of disabling fibromyalgia symptoms, finding them not fully substantiated by the medical record. R. 20. In support of this finding, the ALJ noted that, while the record contained numerous subjective complaints from Berndt, there were few objective findings, and the ones that were in the record showed that Berndt demonstrated good function—including good range of motion without pain; no tenderness; normal muscle bulk, tone, and strength; intact sensation; and a steady gait—despite her symptoms. *Id.* The ALJ also found that Berndt's unexplained cancellations and no-shows, which led to her being discharged from a pain management treatment program, suggested that her condition was not as disabling as alleged. *Id.* Finally, the ALJ noted that multiple treatment providers indicated that Berndt's pain complaints would be under better control if she addressed her anxiety disorder. *Id.*

Berndt takes issue with the ALJ's analysis, arguing that each of his three reasons do not support his finding that Berndt's fibromyalgia-related symptoms did not result in a more restrictive RFC. *See* ECF No. 21 at 7–16. According to Berndt, "[t]he treatment, medical findings, and determination of the condition as a severe impairment by the ALJ constituted the objective evidence necessary to substantiate the condition," and the objective findings cited by the ALJ "have little or nothing to do with fibromyalgia." *Id.* at 7–12. Berndt also criticizes the ALJ for relying on her discharge from pain management without first seeking an explanation for her cancelled and missed appointments. *Id.* at 12. Lastly, Berndt maintains that the ALJ made inconsistent findings with respect to her physical pain complaints and her

mental health symptoms, arguing that "[i]f her mental health was causing a pain overlay as the ALJ asserted, then her mental impairments did have disabling symptoms and limitations." *Id.* at 12–13. Berndt asserts that her fibromyalgia-related functional limitations "can be gleaned" from her function reports and pain questionnaire, which reflect limitations handling, fingering, and reaching and an inability to work a full workweek and workday. *Id.* at 14–15.

Berndt has not shown that the ALJ's evaluation of her subjective fibromyalgia-related symptoms was patently wrong. *First*, Berndt has not demonstrated that the ALJ erred in relying in part on objective findings demonstrating that Berndt had good function despite her symptoms. Berndt focuses on SSR 12-2p, the Social Security Administration's guidance on evaluating fibromyalgia, but as the Seventh Circuit has recognized, that policy interpretation "limits only the evidence used to diagnose the disease as a medically determinable impairment (step two in the five-step analysis). It does not limit the evidence an ALJ can consider in evaluating the *severity* of fibromyalgia for purposes of determining a residual functioning capacity." *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (citing SSR 12-2p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Fibromyalgia, 2012 SSR LEXIS 1 (July 25, 2012)). In finding fibromyalgia to be a severe impairment at step two, *see* R. 15, the ALJ implicitly recognized that the objective evidence was sufficient to establish fibromyalgia as a medically determinable impairment, *see* SSR 12-2p 2012 SSR LEXIS 1, at *3–9 (listing three criteria).

SSR 12-2p goes on to explain that a person's statements about her fibromyalgia-related symptoms and functional limitations are evaluated using the same two-step process used to evaluate all subjective allegations. *See id.* at *13–15. That is, once fibromyalgia is established as a medically determinable impairment, the ALJ must "evaluate the intensity and persistence

of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." *Id.* at \*14. The policy interpretation states that,

> [i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, [the ALJ must] consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

*Id.* The ALJ complied with that directive here, as he considered Berndt's reported activities, Berndt's medication and other treatment, Berndt's discharge from a pain management program, and statements from medical providers and others concerning Berndt's symptoms. *See* R. 18–23.

Moreover, Berndt has not shown that the objective findings cited by the ALJ can *never* be relevant in evaluating the severity of fibromyalgia-related symptoms. In *Gebauer*, the Seventh Circuit recognized that "the Social Security Administration's guidance on how to evaluate pain (fibromyalgia's chief symptom) directs ALJs to consider the very symptoms that the ALJ considered here." *Gebauer*, 801 F. App'x at 410 (citing 20 C.F.R. § 404.1529(c)(2) ("[E]vidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms.")). And other courts, including this one, have recognized that ability-related tests can be relevant to a fibromyalgia claim. *See Madrigal v. Saul*, No. 19-C-1349, 2020 U.S. Dist. LEXIS 75061, at \*13 (E.D. Wis. Apr. 29, 2020) ("[A]n individual's performance in physical measures of ability, such as a range-of-motion test, is at least arguably relevant to her claim of debilitating pain."); *see also Fischer v. Saul*, No. 19-C-291, 2020 U.S. Dist. LEXIS 52481, at \*47–49 (E.D. Wis. Mar. 26, 2020) (rejecting the plaintiff's argument

that the ALJ erred in relying on objective evidence and recognizing that "findings of full motor strength and function in all extremities were relevant" to the plaintiff's fibromyalgia claim). Critically, the ALJ here did not reject Berndt's complaints of disabling fibromyalgia-related symptoms based solely on the objective medical evidence.

*Second*, Berndt has not demonstrated that the ALJ committed reversible error when he relied on Berndt's discharge from pain management as a basis for discounting her fibromyalgia-related pain and fatigue complaints. Berndt does not dispute that a claimant's failure to follow prescribed treatment is in some cases inconsistent with alleged disabling symptoms. Nor could she. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *23 ("[If the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Rather, she maintains that the ALJ violated SSR 16-3p by not first seeking an explanation for her non-compliance. I disagree. Although SSR 16-3p indicates that an ALJ may need to ask a claimant at the administrative hearing why she failed to comply, the policy interpretation also provides that the ALJ may "review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them." *Id.* at *25. The ALJ here explicitly noted that Berndt did not provide a reason for her missed appointments or return her providers' phone calls. R. 20 (citing Exhibit 19F/1). Thus, he was not required to seek a possible explanation at the administrative hearing.

Even if the ALJ arguably should have done more to explore Berndt's possible reasons for non-compliance with her pain management program, any such error was harmless, as

Berndt still has not offered any legitimate reason for cancelling or missing her sessions. *See Cornwell v. Saul*, No. 17-cv-647-wmc, 2020 U.S. Dist. LEXIS 16550, at *34 (W.D. Wis. Jan. 31, 2020) ("While it is true that the ALJ failed to make such an inquiry [into the reasons for non-compliance] in this case, even now, plaintiff does not proffer . . . that there were other legitimate reasons for his non-compliance."); *Gilbertson v. Berryhill*, No. 17-cv-631-jdp, 2018 U.S. Dist. LEXIS 106091, at *16 (W.D. Wis. June 26, 2018) ("But Gilbertson does not offer any alternative explanation . . . to explain any failure to follow recommended treatment. Standing alone, the ALJ's failure to specifically inquire about her failure to follow recommended treatment does not warrant remand.").

*Third*, Berndt has not demonstrated that the ALJ committed reversible error when he considered the effects of Berndt's mental impairments when evaluating her alleged physical symptoms. The ALJ reasonably cited statements from treatment providers that Berndt's anxiety inhibited evaluation of her physical impairments and that her pain may be under better control if her anxiety were controlled better. Berndt believes that this finding is inconsistent with the ALJ determining that the record did not fully substantiate her mental health symptoms. However, I fail to see any inconsistency. Berndt has not cited any evidence to support her argument that a mental impairment must be disabling if it causes a pain overlay. Moreover, the ALJ did not completely reject Berndt's mental health allegations. Rather, he determined at step two that Berndt suffered from severe mental impairments of depression and anxiety, and he included several mental health limitations in the RFC assessment. *See* R. 15–18.

Moreover, assuming for the sake of argument that this was not the strongest reason for discounting Berndt's fibromyalgia-related symptoms, that mistake does not render the entire

18

symptom evaluation patently wrong. The Seventh Circuit has held that, in discounting a claimant's subjective allegations, "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*. 357 F. App'x 717, 722–23 (7th Cir. 2009) (citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)); *see also Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("Here, the ALJ's determination was not patently wrong because of the many specific reasons the ALJ cited from the record.") (citing *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018)). As described above, the ALJ provided other sound reasons for not crediting Berndt's complaints of disabling pain and fatigue.

*Finally*, Berndt's argument that the record supports additional fibromyalgia-related limitations is unpersuasive. For one, most of the "evidence" she cites consists of her own subjective allegations, which the ALJ reasonably discounted (as explained above). Moreover, Berndt has not pointed to significant objective findings the ALJ ignored, and the few objective findings she does reference do not seriously undermine the ALJ's decision. Indeed, the ALJ concluded only that there were "very few objective findings," R. 20, not that there was no objective evidence to support Berndt's fibromyalgia claim. Berndt also does not explain how the objective evidence she cites compelled a more restrictive RFC assessment, and she cannot point to any medical opinion suggesting additional, specific functional limitations resulting from her fibromyalgia.

Accordingly, the ALJ's evaluation of Berndt's fibromyalgia is supported by substantial evidence, and Berndt has not demonstrated that the ALJ committed reversible error in rejecting her complaints of disabling fibromyalgia-related symptoms.

## II. Mental-Health Limitations

Berndt also argues that the ALJ erred in not accounting for her limitations in concentration and attention. *See* ECF No. 21 at 16. Her argument, however, is undeveloped and thus could be rejected on waiver grounds alone. *See Vang v. Saul*, 805 F. App'x 398, 403 (7th Cir. 2020) ("Perfunctory and undeveloped arguments are waived."). Waiver aside, Berndt has not demonstrated that the ALJ's RFC assessment failed to adequately accommodate any limitations she has in this area of mental functioning. At step three, the ALJ concluded that the medical record did not support more than a moderate limitation in Berndt's ability to concentrate, persist, or maintain pace. R. 17. The ALJ noted that Berndt demonstrated good attention and concentration upon examination, *id.* (citing Exhibits 8F/70, 71; 9F/5, 13, 23, 27, 34, 43, 47; 17F/5; 21F), and that her reported activities reflected "some ability to sustain focus and attention, R. 17 (citing Exhibits 4E; 12E). In assessing Berndt's mental RFC, the ALJ limited her to unskilled jobs that involve only simple and routine tasks and only occasional decision making and changes in the work setting. R. 18. The ALJ explained that this RFC was supported by the mental-status exams (which revealed no issues with attention or concentration), Berndt's functioning at the October 2018 psychological consultative exam with Dr. Trippe (wherein she displayed adequate concentration), and the medical opinion evidence in the record (including the opinions of the state-agency psychological consultants and the opinion of Dr. Trippe). *See* R. 21–22.

Berndt's argument that the ALJ's mental RFC assessment failed to "match" Dr. Trippe's findings is unpersuasive. For one, Dr. Trippe did not include any specific functional limitations in his consultative report. In the prognosis section of the report, Dr. Trippe wrote that Berndt displayed "moderate overall impairment in her cognitive, mental, and/or emotion

20

ability to perform unskilled work duties." R. 1532. However, when assessing Berndt's work capacity, he merely stated that "[s]he *may* have difficulty maintaining concentration and attention." *Id.* (emphasis added). The ALJ acknowledged this finding in his decision and explained that Dr. Trippe's opinion was persuasive because it was consistent with the overall record, including Dr. Trippe's own exam findings. R. 22.

Berndt has not demonstrated how the ALJ's mental RFC assessment failed sufficiently to accommodate Dr. Trippe's vague finding with respect to concentration and attention. There is no inherent inconsistency between Dr. Trippe's findings and the ALJ's assessed limitations. As the ALJ observed, Berndt's mental-status exam "was largely normal" and she "did very well during testing." *Id.* Dr. Trippe noted in his report that Berndt "exhibited no significant difficulty staying focused for the hour-long interview." R. 1531. Also, during the mental-status exam Berndt was able to count backwards from one hundred by sevens "without difficulty," and she successfully spelled the "world" backwards. *Id.* Likewise, both state-agency psychological consultants found that, despite having a moderate limitation in concentration, persistence, or maintaining pace, Berndt retained the ability to perform simple, repetitive tasks. *See* R. 76, 79–81, 95, 99–101. And Berndt does not challenge the ALJ's evaluation of those medical opinions.

Moreover, even if the ALJ did err in not accommodating Dr. Trippe's finding that Berndt may have difficulty maintaining concentration and attention, any error was harmless. Berndt "has not suggested what functional limitations the ALJ should have assigned" to better account for her purported difficulties with concentration and attention. *Brock v. Saul*, No. 19-CV-1506, 2021 U.S. Dist. LEXIS 44700, at *10 (E.D. Wis. Mar. 10, 2021). Nor has she pointed to any medical evidence or medical opinion suggesting that her concentration and attention

issues would warrant a specific functional limitation not contained in the RFC assessment. *See Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

Accordingly, the ALJ's mental RFC assessment is supported by substantial evidence, and Berndt has not demonstrated that the ALJ committed reversible error in evaluating Dr. Trippe's consultative exam findings.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence and that Berndt has not demonstrated that the ALJ committed reversible error in evaluating Berndt's fibromyalgia or in assessing her mental RFC. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this <u>8th</u> day of July, 2021.

STEPHEN C. DRIES
United States Magistrate Judge